**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 18-1366**

───────────────

J. DUANE GILLIAM, Guardian of the Estate of Leon Brown; RAYMOND C. TARLTON, Guardian Ad Litem for Henry Lee McCollum,

Plaintiffs - Appellees,

and

HENRY LEE MCCOLLUM; LEON BROWN; GERALDINE BROWN RANSOM, Guardian of Leon Brown; KIMBERLY PINCHBECK, as limited guardian and conservator of the estate of Henry Lee McCollum,

Plaintiffs,

v.

KENNETH SEALEY, both individually and in his official capacity as the Sheriff of Robeson County; ROBERT E. PRICE, Administrator C.T.A. of the Estate of Joel Garth Locklear, Sr.,

Defendants - Appellants,

and

ROBESON COUNTY; TOWN OF RED SPRINGS; KENNETH SNEAD; JOEL GARTH LOCKLEAR; LARRY FLOYD; LEROY ALLEN; ESTATE OF LUTHER HAGGINS; GERALDINE BRITT HAGGINS, as Administratix/Executrix of the Estate of Luther Haggins; PAUL CANADY, Administrator C.T.A of the Estate of Luther Haggins; FAYETTEVILLE OBSERVER-TIMES; ASSOCIATED PRESS; WTVD TELEVISION LLC; CHARLOTTE OBSERVER,

Defendants.

**No. 18-1402**

J. DUANE GILLIAM, Guardian of the Estate of Leon Brown; RAYMOND C. TARLTON, Guardian Ad Litem for Henry Lee McCollum,

Plaintiffs - Appellees,

and

HENRY LEE MCCOLLUM; LEON BROWN; GERALDINE BROWN RANSOM, Guardian of Leon Brown; KIMBERLY PINCHBECK, as limited guardian and conservator of the estate of Henry Lee McCollum,

Plaintiffs,

v.

KENNETH SNEAD; LEROY ALLEN,

Defendants - Appellants,

and

ROBESON COUNTY; TOWN OF RED SPRINGS; KENNETH SEALEY, both individually and in his official capacity as the Sheriff of Robeson County; JOEL GARTH LOCKLEAR; LARRY FLOYD; ESTATE OF LUTHER HAGGINS; GERALDINE BRITT HAGGINS, as Administratix/Executrix of the Estate of Luther Haggins; PAUL CANADY, Administrator C.T.A of the Estate of Luther Haggins; ROBERT E. PRICE, Administrator C.T.A. of the Estate of Joel Garth Locklear, Sr.; FAYETTEVILLE OBSERVER-TIMES; ASSOCIATED PRESS; WTVD TELEVISION LLC; CHARLOTTE OBSERVER,

Defendants.

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.   Terrence W. Boyle, Chief District Judge.  (5:15-cv-00451-BO)

Argued:  March 20, 2019                                          Decided:  July 30, 2019

2

Before NIEMEYER, THACKER, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Niemeyer joined. Judge Richardson wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** James R. Morgan Jr., WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellants. Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees. **ON BRIEF:** Bradley O. Wood, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellants K. Sealey and R. Price. Joshua H. Stein, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina; Matthew W. Sawchak, Brian D. Rabinovitz, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants K. Snead and L. Allen. E. Desmond Hogan, Kirti Datla, David W. Maxwell, Elizabeth C. Lockwood, Matthew J. Higgins, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.

THACKER, Circuit Judge:

This case stems from the wrongful conviction of two brothers, both teenaged boys with severe intellectual disabilities, for the rape and murder of an 11 year old girl in 1983. Henry McCollum and Leon Brown ("Appellees") spent 31 years in prison and on death row[1] before being exonerated based on DNA evidence linking another individual, a man who was known to officers at the time of the investigation, to the crime. Following their release from prison, Appellees brought this case pursuant to 42 U.S.C. § 1983 alleging that the state and county law enforcement officers investigating the crime violated their Fourth Amendment and due process rights.

The officers moved for summary judgment on the basis of qualified immunity. The district court denied their motion, and this appeal followed. Because Appellees have alleged facts sufficient to show that the officers violated their clearly established Fourth Amendment and due process rights, we affirm the district court's denial of qualified immunity.

I.

A.

*The Underlying Crime and Investigation*

Eleven year old Sabrina Buie went missing on the evening of September 24, 1983, in Red Springs, North Carolina. Two days later, her body was discovered in a soybean

---

[1] Brown spent nearly a decade on death row before being retried in 1992 and sentenced to life in prison, while McCollum remained on death row following his second trial.

field near a convenience store in Red Springs. She was found naked from the waist down, with her bra pushed up over the back of her head. Her panties were shoved down her throat with a stick, and she had been sexually assaulted.

The Red Springs Police Department and the North Carolina State Bureau of Investigation ("SBI") worked together to investigate the case. SBI Agents Leroy Allen and Kenneth Snead and Robeson County Detectives Joel Garth Locklear and Kenneth Sealey (collectively, "Appellants") were assigned to the case. While processing the crime scene, Appellants discovered three Schiltz Malt Liquor beer cans, three match sticks, one Newport cigarette butt, and two wooden sticks reddened with blood.

On September 27, 1983, while canvassing the neighborhood for witnesses, Detective Locklear spoke to Henry McCollum, who denied any knowledge of Buie's disappearance. However, the following evening, Agent Snead and Detective Sealey interviewed Ethel Furmage, a high school student, who said that she had "heard at school" that McCollum "had something to do with" Buie's murder. J.A. 304.[2] Shortly after 9:00 that evening, Snead, Sealey, and Agent Allen traveled to McCollum's home to interview him. McCollum agreed to ride with the officers to the police station, where he was fingerprinted and questioned.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

B.

*Interrogations of Appellees*

1.

*McCollum*

What exactly happened in the interrogation room is at the heart of this case and is, as the district court determined, a dispute of material fact that must be determined by a jury. This is what we know for sure. At the time of these events, McCollum was 19 years old, and he suffered from severe intellectual disabilities. He scored a 56 on an IQ test, where any score below a 69 indicates intellectual disability. In high school, McCollum performed at the level of an eight to ten year old. And in 1990, McCollum was formally diagnosed as intellectually disabled. McCollum had never been in legal trouble.

A *Miranda*[3] waiver form bearing McCollum's signature is dated September 28, 1983, at 10:26 p.m. At 2:10 a.m. on September 29, McCollum signed a handwritten confession that was drafted by Agent Snead and witnessed by Detective Sealey and Red Springs Police Department Chief Luther Haggins. This confession stated the following: McCollum, along with four other boys -- Darrell Suber, Louis Moore, Chris (last name unknown), and Leon Brown -- were with Buie at approximately 9:30 p.m. on September 24, the day she went missing. Suber and Chris left the group to buy a six-pack of beer from the nearby convenience store. When they returned, Suber, Chris, McCollum, Moore, and Brown discussed raping Buie, because she had not agreed to have sex with them

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

voluntarily. After this conversation, Moore left. The rest of the group walked with Buie to the woods at the edge of a field and drank beer. Suber and Chris smoked Newport cigarettes.

Per the confession, McCollum grabbed Buie's right arm while Brown grabbed her left arm. The group of boys then took turns raping Buie, with McCollum going third and Brown going last. Afterwards, Suber said they had to do something so that Buie would not tell the police what they had done. Chris tied Buie's pink panties to a stick, then used it to choke Buie to death. While this was happening, McCollum and Brown held Buie down and Suber cut her with a knife. Then, after they believed Buie was dead, the boys dragged her body to the edge of the woods. Suber had blood on his brown corduroy jacket and gray Nike tennis shoes, and Chris had blood on his sneakers.

After McCollum signed the confession, he was placed under arrest for Buie's rape and murder.

## 2.

### *Brown*

During McCollum's interrogation, his mother Mamie Brown and brother Leon Brown arrived at the police station. At approximately 2 a.m. on September 29, and based on McCollum's written confession, Detective Locklear and Chief Haggins began to interrogate Brown.

Brown was 15 years old at the time, and like his brother, he had been diagnosed with severe intellectual disabilities. He consistently scored in the mid-50s range on IQ tests, and although he was in seventh grade, he performed at a third grade level. In 1982,

7

a school psychologist had placed Brown in a special education class. Like his brother, Brown had not previously been in legal trouble.

At 2:24 a.m., Brown signed a form entitled "Juvenile Rights Warning."[4] Then, around 6 a.m., Brown signed a confession that had been drafted by Detective Locklear. Following Brown's confession, he was arrested for the rape and murder of Buie.

3.

*Confession Inconsistencies*

Brown's confession implicated Suber and Chris, but it differed in certain aspects from McCollum's confession. Notably, Brown's confession makes no mention of Moore's involvement, and it does not reference a stick being used to force Buie's underwear down her throat.

The confessions of McCollum and Brown also contained certain details that were later proven false. For example, both confessions stated that Suber and Chris were involved in the crime and took turns raping Buie, but the police verified that Suber, Chris, and Moore all had alibis on the night of the murder. And contrary to the confessions, an autopsy revealed that Buie's panties were white, not pink, and she had no stab wounds.

---

[4] This form lists the rights available to a juvenile questioned by law enforcement officers, including the rights "to remain silent"; "to have a parent, guardian, or custodian present during questioning"; and "to talk with a lawyer for advice before questioning and to have that lawyer with you during questioning." J.A. 1313.

8

## C.

### *Criminal Proceedings and Post-Conviction Relief*

#### 1.

##### *1984 Trial*

Appellees were indicted by a grand jury on January 3, 1984, on charges of first-degree murder and rape. They were tried together in Robeson County Superior Court in October 1984. The prosecutor was District Attorney Joe Freeman Britt, McCollum was represented by Earl Strickland, and Brown was represented by Robert Johnson.

Appellees both moved to suppress their confessions. These motions were denied. The trial court concluded that both McCollum and Brown had voluntarily gone to the police station; each had knowingly and intelligently waived his rights; and each had made statements freely, voluntarily, and knowingly. Appellees both testified at trial, and each was convicted and sentenced to death.

#### 2.

##### *Second Trials*

On appeal, the North Carolina Supreme Court reversed and remanded the case for a new trial based on error in the jury instructions. *See North Carolina v. McCollum*, 364 S.E.2d 112 (N.C. 1988). Appellees were then tried separately in adjacent counties.

McCollum was retried in Cumberland County in November 1991. The Cumberland County Superior Court denied McCollum's motion to suppress his confession, concluding that McCollum's constitutional rights were not violated by his arrest, detention, interrogation, or confession; that his confession was made freely and voluntarily; and that

McCollum waived his rights freely, knowingly, and intelligently. During the November 1991 trial, and with McCollum's consent, McCollum's attorney argued to the jury that McCollum was present for the rape and murder of Buie, and he asked the jury to return a verdict of second-degree murder. McCollum was found guilty of first-degree murder and rape, and he was again sentenced to death. The North Carolina Supreme Court affirmed McCollum's conviction and sentence. *See North Carolina v. McCollum*, 433 S.E.2d 144 (N.C. 1993). The United States Supreme Court denied McCollum's petition for writ of certiorari. *See McCollum v. North Carolina*, 512 U.S. 1254 (1994).

After McCollum's trial, Brown was retried in Bladen County Superior Court in June 1992. Brown's motion to suppress his confession was denied after the trial court concluded that Brown knowingly, intelligently, and voluntarily waived his rights; that his constitutional rights had not been violated; and that his confession was voluntary. The trial court later granted a defense motion to dismiss the first-degree murder charge, finding that Brown had withdrawn from the conspiracy to commit murder. The jury found Brown guilty of first-degree rape, and he was sentenced to life in prison. The North Carolina Court of Appeals and the North Carolina Supreme Court affirmed Brown's conviction and sentence. *See North Carolina v. Brown*, 436 S.E.2d 163 (N.C. Ct. App. 1993); *North Carolina v. Brown*, 453 S.E.2d 165 (N.C. 1995). Brown did not file a petition for writ of certiorari to the United States Supreme Court.

10

3.

*NCIIC Investigation*

In 2009, Brown sought assistance from the North Carolina Innocence Inquiry Commission ("NCIIC"), and the NCIIC accepted his case. The NCIIC then reached out to McCollum and accepted his case as well. In its investigation, the NCIIC uncovered DNA evidence on the Newport cigarette butt found at the scene of the crime. The DNA matched Roscoe Artis, a man known to Appellants during the investigation of Buie's murder.

In 1984, Artis was convicted of a crime strikingly similar to Buie's murder: the first-degree murder and rape of Joann Brockman, also in Red Springs, North Carolina. On October 22, 1983 -- less than one month after Buie's murder -- Brockman's body was found naked except for a sweater and bra pushed up above her breasts, and an autopsy revealed that she died from manual strangulation during sexual intercourse. Artis was arrested the same day, and he was tried in August 1984. The prosecutor for Artis's trial was district attorney Joe Freeman Britt, and Artis was represented by Earl Strickland -- both of whom would be involved in McCollum and Brown's October 1984 trial just two months later. Appellants Agent Allen and Detective Locklear, who were involved in the investigation of Brockman's murder, testified for the state in Artis's trial.[5] Artis received a death sentence,

---

[5] Detective Locklear testified that he responded to the scene of the crime, observed the victim's body, and interviewed Artis on the day of Brockman's murder. According to Locklear, during this interview Artis confessed to the murder and led officers back to the location where Brockman's body had been discovered. Allen testified that he transported certain evidence, including a blood sample taken from Artis, to the SBI lab for testing as part of the investigation.

which was commuted to life in prison. *See North Carolina v. Artis*, 384 S.E.2d 470 (N.C. 1989), *judgment vacated*, 494 U.S. 1023 (1990); *see also North Carolina v. Artis*, 406 S.E.2d 827 (N.C. 1991).

The DNA tested on other items of physical evidence from the scene of Buie's murder did not match McCollum or Brown.

4.

*MAR Court Proceedings and Pardons*

Based on this DNA evidence, Appellees filed motions for appropriate relief ("MAR") in the Robeson County Superior Court. At a hearing on these motions held September 2, 2014, the NCIIC's investigator testified about inconsistencies between Appellees' written confessions and the DNA match to Artis on the cigarette. The state did not contest that the newly discovered DNA evidence was favorable to Appellees, and it conceded that Appellees had satisfied the requirements of N.C. Gen. Stat. § 15A-270(c), which governs the relief available to petitioners who come forward with favorable DNA evidence post-conviction. The MAR court held, "especially when considered together with the rest of the results of the [NCIIC]'s investigation," the favorable DNA evidence "tend[s] to establish Henry McCollum's and Leon Brown's innocence of [the] crime for which they were convicted and sentenced." J.A. 309. Accordingly, the MAR court vacated Appellees' convictions and sentences from Robeson, Cumberland, and Bladen counties, dismissed with prejudice all charges in the cases, and ordered Appellees' immediate release.

On June 5, 2015, North Carolina Governor Pat McCrory issued full pardons of innocence to Appellees.

D.

*District Court Proceedings*

Appellees filed this action against Appellants on August 31, 2015. The amended complaint alleges four claims arising pursuant to 42 U.S.C. § 1983: false arrest, malicious prosecution, deprivation of due process, and municipal liability. At the root of these claims, Appellees assert that Appellants coerced and fabricated Appellees' confessions, and then, to cover up this wrongdoing, Appellees allege that Appellants withheld in bad faith exculpatory evidence that demonstrated Appellees' innocence and buried pieces of specific evidence indicating that Artis -- and not Appellees -- raped and murdered Buie.

Appellants sought summary judgment on the basis of qualified immunity. The district court concluded that genuine disputes of material fact preclude summary judgment based on qualified immunity, and that a jury must determine whether Appellees' confessions were voluntary and whether Appellants acted in bad faith while investigating Buie's murder after the confessions were obtained. The district court summarized these disputes of material fact as follows.

1.

*The Confessions*

a.

*McCollum*

The district court noted that "[t]he parties offer[ed] drastically different versions of the events surrounding the confessions given by [Appellees]." J.A. 318.  Agent Snead and Detective Sealey stated that they began questioning McCollum around 9:30 p.m.  But Snead and Sealey's recollections of when McCollum received his *Miranda* warning differ; Snead testified in his deposition that McCollum signed the waiver prior to questioning, whereas Sealey testified in his deposition that McCollum signed the waiver after he admitted to holding Buie down.  Sealey testified that he asked few if any questions during the interview, and that Snead took the lead.  Agent Allen was also present during the interview, according to Snead.

After what Detective Sealey thought might have been five or ten minutes of questioning -- but Agent Snead recalls being anywhere from twenty to forty-five minutes -- McCollum admitted to them, "I just held her down." J.A. 319.  Sealey testified at his deposition that he thought McCollum was about to have a seizure just before he admitted this; meanwhile, Snead testified at his deposition that McCollum was extremely calm.

According to Agent Snead, he talked with McCollum until about 1:50 a.m., McCollum confessed, and Snead wrote out McCollum's statement.  Then, Snead testified, McCollum confronted Brown and Suber, who were at the police station, and told them that he (McCollum) had told the truth and wanted them to also tell the truth about killing Buie.

14

McCollum then asked Chief Haggins if he could go home, and Snead informed McCollum that things had changed and asked Haggins to arrest McCollum for murder.

As the district court noted, "McCollum's description of his interview by Snead, Sealey, and Allen bears no resemblance to the [officers' accounts]." J.A. 319. According to McCollum, the officers told him that if he signed a form -- the *Miranda* waiver form -- they would let him go home. McCollum signed the form without reading it. In his deposition, McCollum testified that the officers questioning him "got into his face, hollered at him, . . . threatened him, . . . [and] McCollum repeatedly denied being involved." *Id.* According to McCollum, he was called racial epithets, and Detective Sealey threatened that McCollum "was going to get the gas chamber," J.A. 988, if he did not talk. McCollum believed this to mean that Sealey had the "power and authority" to kill him. *Id.* at 1022. During the interrogation, McCollum's mother arrived at the station and asked the officers to see her son. McCollum likewise asked if he could see his mother. The officers refused, and McCollum heard one of the officers tell his mother to "shut up" and threaten to "lock her up." *Id.* at 986–87. McCollum further testified that the officers told him to sign a paper that said if he could help them in the case as a witness, they would let him go home. McCollum signed the paper -- which was actually the confession written out by Snead -- but he did not read it and it was not read to him. McCollum denies that he confessed to raping and murdering Buie.

15

b.

*Brown*

As the district court summarized, Brown came to the police station with his mother at about 11 p.m. on September 28, 1983, while McCollum was being questioned. Brown testified at the 1984 trial that he could hear his brother crying when he arrived. At around 2:30 a.m., while Brown was waiting at the station with L.P. Sinclair (a friend of the boys and eventual witness in the case), Detective Locklear and Agent Allen took Brown to an interrogation room and began questioning him.

Agent Allen testified at his deposition that he read Brown his juvenile rights, including the right to have a parent present, and that Brown stated he understood his rights and wished to answer questions without a lawyer or parent present. Allen stated that he did not recall Brown asking to speak with his mother, or Brown's mother asking to see Brown. Agent Snead testified at his deposition that he does not know why Brown was taken to an interview room, and that he witnessed Brown's rights form but was not in the room when Brown confessed. Detective Locklear testified at the 1984 trial that he took Brown's statement, and that Brown was "quite alert of mind and very precise in what he wanted to say to me." J.A. 321. Further, Locklear testified that he made Brown no promises and did not threaten him.

Brown, meanwhile, testified at his 1984 trial that Detective Locklear did not advise him of his rights, that Brown asked for his mother when an officer grabbed Brown's arm, and that Brown (like McCollum) was told he would be taken to the gas chamber if he did not sign the rights waiver. Then, Brown testified that when the officers gave him a piece

16

of paper, he circled "no" on it. According to Brown, that "no" was supposed to indicate that he could not help the officers. Brown testified that the officers then "began to hammer him, calling him racial epithets and stating that he [Brown] had committed the crime or that he knew something about it." J.A. 320. During Brown's interrogation, his mother was knocking on the door asking to see him, but she was refused entry. Brown denied any knowledge of the crime and stated that he was innocent. Brown testified at his deposition that he did not say the things that are written in the confession; instead, Detective Locklear drafted it and told Brown to sign it, which Brown did after an officer told him doing so would ensure his release. Locklear then read the confession to Brown, and Brown told the officers that it was not true. Like his brother, Brown was then placed under arrest.

## 2.

### *The Investigation*

The district court noted additional disputes of material fact regarding Appellants' conduct during the investigation that precluded summary judgment on Appellees' due process claims. Specifically, these factual disputes involved Appellees' assertion that Appellants failed to investigate and withheld exculpatory evidence regarding (1) the similarities between the rape and murder of Buie and Artis's rape and murder of Brockhart; (2) a statement by a potential eyewitness, Mary McLean Richards, that she saw Artis attacking Buie; and (3) the alleged coerced testimony of Brown and McCollum's friend L.P. Sinclair.

Appellees assert that Artis was a suspect in Buie's murder, but Appellants failed to disclose this to Appellees. According to Appellees, on October 5, 1984, three days before

Appellees' first trial, investigators submitted Artis's fingerprints to the SBI for comparison to the latent prints found on the beer can at the Buie crime scene. Artis was listed as a suspect on the fingerprint comparison request. However, the investigators canceled the request that same day, and the fingerprint comparison was never completed.

Next, Appellees assert that Richards told Appellants that she witnessed Artis attacking Buie on the night of the murder, and that she attempted to intervene but Artis frightened her away. Richards further testified that when she went home and told her mother what she had seen, her mother would not allow her to call the police. Richards testified in her deposition that she provided this information to Detective Sealey during the investigation in 1983. However, Sealey's investigation notes do not reflect this information.

Finally, Appellees assert that Appellants coerced false testimony from Sinclair. After meeting with investigators multiple times, Sinclair submitted to, and passed, a polygraph test three days before Appellees' first trial, declaring he "did not know anything about [Buie's death]." J.A. 1305. SBI then marked him as a suspect in the case and ordered analysis of his fingerprints at the same time it requested an analysis of Artis's fingerprints. Sinclair then changed his story and testified at Appellees' 1984 trial that McCollum had confessed to him the day after Buie's murder. Sinclair further testified that McCollum and Brown had discussed raping Buie in his presence and that he (Sinclair) had declined to participate.[6]

---

[6] Sinclair was killed in 1990, prior to Appellees' retrials.

18

For their part, Appellants dispute that they should have taken any additional action with respect to investigating Artis. Appellants further dispute that Richards made a statement in 1983 to any member of law enforcement that she witnessed Buie's attack, or that any Appellant coerced or instructed Sinclair to testify untruthfully at the 1984 trial.

II.

We review a district court's denial of summary judgment in the qualified immunity context de novo, and we "view all reasonable inferences drawn from the evidence in the light that is most favorable to the non-moving party." *Smith v. Munday*, 848 F.3d 248, 251 (4th Cir. 2017) (internal quotation marks omitted); *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). To be granted summary judgment, Appellants must prove that there is no genuine dispute of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Qualified immunity protects government officials from liability for violations of constitutional rights so long as they could reasonably believe that their conduct did not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Further, qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). Thus, to the extent a district court's denial of a claim of qualified immunity turned on an issue of *law*, it is immediately appealable. *See id.* at 530. But if the denial turned on an issue of *fact*, "we lack jurisdiction to re-weigh

19

the evidence in the record to determine whether material factual disputes preclude summary disposition." *Iko*, 535 F.3d at 234. Thus, the question before us is whether, "if we take the facts as the district court gives them to us, and we view those facts in the light most favorable to [Appellees]," Appellants are still entitled to qualified immunity. *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019) (footnote omitted).

## III.

Appellants raise a host of challenges to the district court's denial of summary judgment, asserting that the district court: (1) misapplied the summary judgment standard by failing to parse Appellants' liability individually; (2) erred in denying Appellants' claims of qualified immunity as to Appellees' false arrest and malicious prosecution claims; and (3) erred in denying Appellants' claims of qualified immunity as to Appellees' due process claims. We address each issue in turn.[7]

## A.

### *Individualized Liability Analysis*

Appellants assert that the district court broadly misapplied the test for qualified immunity because it did not identify "what each individual officer knew, when he knew it, and what specific actions he did or did not take." Appellants' Br. 20. Critically, Appellants did not argue before the district court that *individual* officers were entitled to qualified

---

[7] Appellants also argue that the district court erred in denying Appellants' motion for summary judgment for Appellant Sealey in his official capacity. Because we affirm the district court's denial of summary judgment for the individual capacity claims against Appellant Sealey, we decline to exercise pendant jurisdiction over the official capacity claim.

20

immunity based on the officer's *individual* actions, but instead asserted collective qualified immunity defenses. In other words, Appellants fault the district court for not identifying and resolving in their favor individual liability arguments that Appellants themselves did not raise.

It is true that the defense of qualified immunity is a defense for individual defendants. But it would be counterproductive to require a district court to wade through convoluted issues of fact at this stage in order to determine individual liability, where: (1) Appellants did not raise individualized qualified immunity arguments before the district court but instead asserted collective qualified immunity defenses; (2) the facts have yet to be resolved, and the district court only determined whether qualified immunity applies as a matter of law;[8] and (3) Appellees alleged that Appellants acted in concert to violate their constitutional rights. Accordingly, the district court did not improperly apply the test for qualified immunity by waiting to parse the liability of each individual defendant as it relates to each claim until the facts are determined.

B.

*False Arrest and Malicious Prosecution Claims*

Appellants next challenge the district court's denial of Appellants' motions for summary judgment as to Appellees' false arrest and malicious prosecution claims. The

---

[8] *See* J.A. 330 ("In light of plaintiffs' allegations that the defendants worked in concert to deny plaintiffs' their constitutional rights as well as the specifics regarding the grouping of SBI and Robeson County defendants to engage in different aspects of plaintiffs' interrogations, arrests, and investigations, the Court will not at this time attempt to parse the liability of each individual defendant as it relates to each claim.").

21

district court denied Appellants' motions after concluding that, viewing the facts in the light most favorable to Appellees, Appellees presented evidence that their confessions were fabricated or coerced, which was sufficient to create a genuine issue of material fact as to whether Appellants violated Appellees' clearly established constitutional rights not to be arrested in the absence of probable cause and on the basis of a coerced confession. This dispute of fact precluded a ruling on qualified immunity.

Appellants argue that they did not violate Appellees' constitutional rights because probable cause existed for Appellees' arrest as a matter of law. Alternatively, Appellants argue that even if they did violate Appellees' constitutional rights, the officers could have believed that their conduct was lawful because those constitutional rights were not clearly established by existing precedent. For the reasons that follow, we affirm the district court's denial of summary judgment as to Appellees' false arrest and malicious prosecution claims.

1.

*Whether Appellants' Violated Appellees' Constitutional Rights*

Appellants argue that they did not violate Appellees' constitutional rights for three reasons: (1) North Carolina's collateral estoppel doctrine prevents relitigation of the constitutional issues alleged; (2) McCollum's attorney's admission at McCollum's 1991 trial judicially estops McCollum from challenging the voluntariness of his confession; and (3) and Appellants had probable cause to arrest Appellees as a matter of law. We address each in turn.

22

a.

*Collateral Estoppel*

Appellants contend that North Carolina's collateral estoppel doctrine prevents Appellees from relitigating in their § 1983 case whether probable cause existed to support their arrests and whether their confessions were voluntary. Specifically, Appellants argue that under North Carolina law, (1) Appellees' criminal convictions -- though later vacated, and despite Appellees receiving pardons of innocence from the governor -- conclusively establish that probable cause existed for their arrest; and (2) the state court judges' rulings on the Appellees' motions to suppress their confessions in their criminal cases conclusively establish that the confessions were voluntary. We will address these collateral estoppel issues in turn, starting with whether Appellees' criminal convictions conclusively establish that there was probable cause for Appellees' arrests.

i.

*Criminal Convictions*

At the outset, it is necessary to address how state collateral estoppel doctrine bears on this federal § 1983 action. Pursuant to 28 U.S.C. § 1738, federal courts must give full faith and credit to state court judgments. Additionally, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Accordingly, and as the district court noted in its opinion, "[t]he doctrines of res judicata and collateral estoppel apply to § 1983 actions, and federal courts must afford preclusive effect to issues which have been decided by state courts when the courts

23

of that state would do so." J.A. 311; *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 85 (1984) ("We hold, therefore, that petitioner's state-court judgment in this litigation has the same claim preclusive effect in federal court that the judgment would have in the Ohio state courts.").

Appellants contend that North Carolina courts would find that Appellees' criminal convictions, even though they have since been vacated, collaterally estop Appellees from challenging whether Appellants had probable cause to arrest. *See Griffis v. Sellars*, 20 N.C. 315 (1838) (holding that conviction is conclusive evidence of probable cause, even where "a contrary verdict and judgment be given in a higher Court"); *see also Overton v. Combs*, 108 S.E. 357, 358 (N.C. 1921) (holding that a conviction establishes the existence of probable cause, even if the conviction "is thereafter set aside or reversed on appeal or other ruling in the orderly progress of the cause").

Contrary to Appellants' assertion that this rule "remains settled North Carolina law to this day," Appellants' Br. 26, North Carolina courts have repeatedly called this rule into question. *See Myrick v. Cooley*, 371 S.E.2d 492, 495 (N.C. Ct. App. 1988) ("We question the continuing validity of this rule . . . which allows a District Court judgment which is subsequently overturned upon a trial de novo in Superior Court to insulate the arresting officer from liability . . . ."); *see also Simpson v. Sears, Roebuck & Co.*, 752 S.E.2d 508, 509 (N.C. Ct. App. 2013) ("We note . . . that this doctrine has eroded somewhat over time."). Accordingly, there is reason to doubt whether it remains good law that even a

24

vacated conviction precludes an individual from challenging whether there was probable cause for his/her arrest in North Carolina.[9]

We need not resolve these uncertainties in North Carolina law, however, because to the extent it remains the rule that reversed or vacated judgments are afforded preclusive effect on the issue of probable cause, and assuming this is a matter of state collateral estoppel doctrine and not a pleading requirement for state malicious prosecution claims (as argued by Appellees), we conclude that North Carolina courts would refuse to give preclusive effect to a judgment that was obtained improperly and later invalidated.

As Appellants concede, there is an exception to the rule that even reversed or vacated judgments are afforded preclusive effects on the issue of probable cause: "where a conviction [is] procured by 'fraud or other unfair means,' it [does] not conclusively

---

[9] Additionally, we question whether a state's collateral estoppel doctrine can require a federal court to afford preclusive effects to an *invalid* state judgment in a federal § 1983 case. Such an outcome would conflict with the Supreme Court's holding in *Heck v. Humphrey*, which specifically permits a plaintiff to proceed with a § 1983 action when a conviction has been reversed, expunged, or declared invalid:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. 477, 486–87 (1994) (footnote omitted). Because we conclude that North Carolina courts would not afford preclusive effect to Appellees' vacated convictions in this case, we need not resolve this question.

25

establish probable cause." *Simpson*, 752 S.E.2d at 509 (quoting *Myrick*, 371 S.E.2d at 495). Appellants assert, however, that the fraud exception *only* applies when convictions were appealed to the superior court and reversed. Thus, Appellants argue, the exception does not apply in this case, where Appellees' convictions were affirmed on direct appeal but later vacated in the superior court on a motion for appropriate relief.

Appellants cite two cases to support this assertion: *Moore v. Winfield*, 178 S.E. 605 (N.C. 1935), and *Simpson v. Sears, Roebuck & Co.*, 752 S.E.2d at 510. But neither case justifies reading the fraud exception so narrowly. Both *Moore* and *Simpson* involved convictions that were reversed on direct appeal, and both courts dealt with the facts before them. Neither *Moore* nor *Simpson* display an intention to exclude convictions that were vacated or otherwise invalidated on the merits in ways other than reversal in the superior court. And Appellants do not provide any reason (much less a compelling reason) to explain why North Carolina's collateral estoppel doctrine would differentiate between invalidations on the merits.

Accordingly, the most sensible reading of the fraud exception is the one espoused by the North Carolina Court of Appeals in *Myrick*: "*[I]n the absence of a showing that the District Court conviction of Myrick was obtained improperly*, the conviction establishes, as a matter of law, the existence of probable cause for his arrest and defeats both his federal and state claims for false arrest or imprisonment." 371 S.E.3d at 495 (emphasis supplied). In this case, Appellants have sufficiently alleged that their now-vacated state court convictions were obtained improperly. Accordingly, collateral estoppel does not preclude Appellants from challenging the probable cause for their arrests.

26

ii.

*Voluntariness of Confessions*

Next, Appellants assert that Appellees are estopped from disputing the voluntariness of their confessions in this § 1983 action because the state court judges presiding over Appellees' criminal trials ruled that the confessions were voluntary.

Appellants' contentions are meritless. Appellees' criminal convictions were *vacated*. Apart from the use of criminal convictions to establish probable cause, which is not relevant to Appellants' voluntariness argument, North Carolina collateral estoppel cases uniformly require a judgment to be valid to have preclusive effect. *See, e.g.*, *North Carolina v. Jones*, 808 S.E.2d 280, 283 (N.C. Ct. App. 2017) ("The doctrine of collateral estoppel means simply that when an issue of ultimate fact has once been determined by a *valid and final judgment*, that issue cannot again be litigated between the same parties in any future lawsuit." (emphasis supplied) (internal quotation marks omitted)); *North Carolina v. Spargo*, 652 S.E.2d 50, 53 (N.C. Ct. App. 2007) ("Under the doctrine of collateral estoppel, an issue of ultimate fact, once determined by a *valid and final judgment*, cannot again be litigated between the same parties in any future lawsuit." (emphasis supplied) (citation omitted)). Accordingly, collateral estoppel does not prevent Appellees from litigating the voluntariness of their confessions because there is no valid and final judgment on the issue.

27

b.

*Judicial Estoppel*

Appellants further allege that Appellee McCollum's attorney's judicial admission at McCollum's 1991 trial -- that McCollum "was there" during the rape and murder, *see* Appellants' Br. 48 -- judicially estops McCollum from challenging the voluntariness of his confession in his § 1983 action.

Of note, Appellants point to no case holding judicial estoppel to apply in comparable circumstances, and as we have made clear, the doctrine of judicial estoppel "must be applied with caution" and only "in the narrowest of circumstances." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). In *Lowery*, we applied judicial estoppel to preclude a plaintiff from asserting in a § 1983 case that he did not "maliciously attack[]" a police officer -- a claim that was directly contrary to that plaintiff's guilty plea related to the underlying encounter, during which he specifically admitted that he "maliciously attacked" the officer. *Id.* at 221, 223. There are significant differences between (1) estopping a litigant from basing a civil claim on factual allegations that are directly contrary to specific admissions made by that litigant during a guilty plea for the same conduct; and (2) binding a party to statements previously made by counsel in a criminal trial involving the death penalty, especially when the conviction resulting from that criminal trial was subsequently vacated.

The *Lowery* court listed three elements "that have to be met before courts will apply judicial estoppel": (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation"; (2) "the prior inconsistent

28

position must have been accepted by the court"; and (3) "the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" 92 F.3d at 224 (quoting *Tenneco Chems., Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982)). Appellants make no attempt to show that all three factors are present in this case. Nor could they: significantly, there is no evidence that counsel, either during the 1991 trial or in this § 1983 case, "intentionally misled the court to gain unfair advantage." *Id.* McCollum's counsel's attempt during the 1991 trial to "make a case for mercy in order to save his client's life," Appellees' Br. 38, does not judicially estop McCollum from challenging the voluntariness of his confessions in this case.

c.

*Probable Cause as a Matter of Law*

Finally, Appellants assert that they did not violate Appellees' constitutional rights because they had probable cause to arrest Appellees as a matter of law, on the basis of Appellees' confessions and subsequent incriminating statements. The district court rejected this argument, concluding that whether Appellants had probable cause to arrest Appellees turns on whether Appellees' confessions were coerced or fabricated, which is a factual question.

As this court has explained, "[p]robable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Id.* (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). "It is an objective standard of

probability that reasonable and prudent persons apply in everyday life." *Id.* (quoting *Gray*, 137 F.3d at 769). In making this inquiry, we consider only the information the officers had at the time of the arrest. *See id.*; *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016). Additionally, "we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *Munday*, 848 F.3d at 253 (quoting *Graham*, 831 F.3d at 185).

Viewing the facts recited by the district court in the light most favorable to Appellees, there is no basis for us to conclude that Appellants had probable cause to arrest Appellees as a matter of law. A coerced or fabricated confession that police know to be coerced -- as Appellees assert here, based on the use of coercive interrogation tactics, the age and intellectual disabilities of Appellees, and the inconsistencies between the confessions and the crime scene -- does not give police probable cause to arrest the suspect as a matter of law. *See Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession."). For the same reason, McCollum's confession implicating Brown, if police knew it was coerced or fabricated, did not provide probable cause for Appellants to arrest Brown.[10] Accordingly, the district court did not err in

---

[10] Appellants also assert that even if McCollum's confession did not establish probable cause on its own, McCollum's subsequent statements to police and others corroborated his first confession and "reaffirmed" the probable cause. Appellants' Br. 65. These statements -- to the extent they are not factual disputes that must be determined by a jury -- occurred after McCollum was arrested and were not "information the officers had at the time" of the arrest. *Munday*, 848 F.3d at 253. As a result, any subsequent incriminating statements could not "cure" arrests made without probable cause.

concluding that Appellants did not have probable cause as a matter of law to arrest Appellees, and whether Appellees' confessions were coerced or fabricated must be determined by a jury.

*Whether Appellants' Constitutional Rights Were Clearly Established*

Appellants next assert that even if they did violate Appellees' constitutional rights, the officers could have believed that their conduct was lawful because those constitutional rights were not clearly established by existing precedent. Specifically, Appellants argue that because "[t]here is no bright-line rule for determining whether a suspect's statements were given voluntarily," Appellants' Br. 69 (quoting *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009)), they cannot be liable for allegedly coercing Appellees' confessions because qualified immunity ensures that officers will be liable "only for 'transgressing bright lines.'" *Id.* (quoting *Doe v. Broderick*, 225 F.3d 440, 453 (4th Cir. 2000)).

Appellants are correct that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). However, there does not need to be a case directly on point for a right to be clearly established, and the fact that the voluntariness of a confession is a fact-specific inquiry does not excuse Appellants from abiding by clearly established law regarding coercive police conduct. "Clearly established . . . includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle

31

invoked." *Id.* at 240 (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). "In the end, the lodestar for whether a right was clearly established is whether the law 'gave the officials fair warning that their conduct was unconstitutional.'" *Id.* at 238 (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)).

There can be no reasonable dispute that it was clearly established in 1983 that an arrest in the absence of probable cause was a violation of an individual's Fourth Amendment rights, and that a coerced confession could not form the basis of probable cause for an arrest. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Ashcraft*, 322 U.S. at 155. Further, existing precedent in 1983 would have made it clear to a reasonable officer that the police conduct at issue here, viewed in the light most favorable to Appellees, was coercive.

For example, in *Ashcraft*, the Supreme Court concluded that questioning a suspect continuously for 36 hours, without rest or sleep, was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear." 322 U.S. at 154. To be sure, Appellees' interrogations did not span 36 hours, but Appellees were questioned late in the night and into the very early morning without sleep. And unlike Appellees, the suspect in *Ashcraft* was a 45 year old man with no intellectual disability or other characteristic that would make him particularly vulnerable to coercion. Of note, the Supreme Court's decision in *Ashcraft* established that an interrogation can be coercive *solely* due to the length of the questioning,

32

even when there is no allegation that the questions or other police conduct was itself coercive, or that any violence was involved.[11]

Then, in *Haley v. Ohio*, the Supreme Court held that it was coercive to question a 15 year old boy alone for about five hours, with no parent or lawyer present and without advising the suspect of his right to counsel.[12]  332 U.S. 596, 598 (1948).  This was true even though the suspect's written confession included a statement about his right not to make the statement.  As the Court held:

> What transpired would make us pause for careful inquiry if a mature man were involved. . . . A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition.  Mature men possibly might stand the ordeal from midnight to 5 a.m.  But we cannot believe that a lad of tender years is a match for the police in such a contest.

*Id.* at 599–600.

And in *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977), we concluded that a confession was involuntary when it was coerced by psychological means and induced by a promise that the suspect's girlfriend would be released from jail if he confessed.  As we noted, "It has long been recognized that involuntary confessions may be exacted as a result of mental coercion as well as physical abuse."  *Id.* at 877.

---

[11] Appellants make much of the fact that the officers "did not hit or beat" Appellees during the interrogation.  Appellants' Br. 5, 40.  As *Ashcraft* makes clear, violence is not the only indicator of coercive police interrogations.  And, in any event, Appellants did threaten Appellees, including with the specter of the gas chamber.

[12] Although the suspect alleged that he had been beaten by the officers, the Supreme Court did not consider this evidence.  *See Haley*, 332 U.S. at 597–98.

33

Significantly, each of the police strategies found to be coercive in these cases were present in Appellees' interrogations. Viewing the evidence in the light most favorable to Appellees, (1) the interrogations took place very late in the night into the early morning; (2) Appellees were 19 and 15, both with serious intellectual disabilities; (3) Appellants threatened Appellees with the gas chamber and yelled racial epithets at them; (4) neither Brown nor McCollum was aware of his rights; and (5) both Appellees were "tricked," J.A. 600, into signing the confessions drafted by Appellants. Appellees' "background[s] and experience[s]," such as their age, mental disabilities, and lack of prior interactions with the police, are highly "relevant to the totality of the circumstances" of the interrogation. *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017); *see also United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012) ("[P]ersonal attributes," such as "age, education, intelligence, and mental state" are relevant considerations). And, similar to *Ferguson*, Appellees alleged that Appellants induced their confessions using a number of promises and threats: that Appellees could go home if they signed the *Miranda* waivers and written confessions, which officers suggested were merely paperwork for their release; that Appellants would arrest Appellees' mother; and that Appellees would be taken to "the gas chamber" if they did not confess, J.A. 319, 321.

Appellants rely heavily on our decision in *United States v. Wertz*, 625 F.2d 1128 (4th Cir. 1980), to argue that the alleged actions of the officers here did not render Appellees' confessions involuntary. According to Appellants, *Wertz* stands for the proposition that "a gun . . . drawn on a suspect shortly before the suspect made an incriminating statement [does] not render the statement involuntary." Appellants' Br. 43.

34

Thus, Appellants' argument goes, if drawing a gun on a suspect is not coercive, neither is threatening a suspect with the gas chamber. But this was not at all our holding in *Wertz*. There, we emphasized that whether a confession is involuntary "is a question of fact to be determined from 'the totality of all the surrounding circumstances[,] both the characteristics of the accused and the details of the interrogation.'" *Wertz*, 625 F.2d at 1134 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). This determination may not "rest solely upon any one circumstance." *Id.* We did not hold, as Appellants suggest, that an officer drawing a gun on a suspect to extract a confession could not result in an involuntary confession -- quite the opposite is true. *See Beecher v. Alabama*, 389 U.S. 35 (1967) (holding a confession involuntary where the suspect was ordered at gunpoint to confess or be killed). The circumstances in *Wertz* bear no resemblance to the facts alleged by Appellees here.[13]

In light of all of the above, the circumstances of Appellees' interrogations easily fall within the bounds of coercive police conduct outlined in *Ashcraft*, *Haley*, *Ferguson*, and other established precedent as "so inherently coercive that its very existence is

---

[13] In *Wertz*, an undercover officer posing as an illegal drug trafficker attempted to purchase a bag of heroin from a suspect, but instead purchased a $1,300 bag of sugar. The undercover officer -- still appearing to be a drug trafficker, as far as the suspect knew -- confronted the suspect about the "rip-off" in a parking garage. A fight ensued, and the undercover officer drew his gun. At some point during the encounter, the suspect "confessed" that the undercover officer's confidential informant was to blame for the sugar. We concluded that the sole fact that the undercover officer drew his gun during the fight was not sufficient to establish that the suspect's statements were involuntary, where "[n]one of the factors found important on the voluntariness issue, other than that one fact, was present," and "[t]he encounter had none of the aspects of a police interrogation, with its inherent compulsions." *Wertz*, 625 F.2d at 1134, 1135.

irreconcilable with the possession of mental freedom" by Appellees. *Ashcraft*, 322 U.S. at 154. Therefore, the district court did not err by concluding that Appellees' right not to be arrested without probable cause based on a coerced and fabricated confession was clearly established in 1983, and the district court was correct to deny summary judgment to Appellants on the basis of qualified immunity in light of the numerous material disputes of fact.

## C.

### *Due Process Claims*

Appellants next challenge the district court's denial of summary judgment as to Appellees' due process claims. Appellees assert that Appellants, in order to shield their wrongful conduct related to the coerced or fabricated confessions, "hid exculpatory information and blocked the production of evidence that showed [Appellees'] innocence." Appellees' Br. 11. Specifically, Appellees allege that Appellants violated the *Brady* doctrine[14] by failing to disclose (1) evidence that another suspect, Roscoe Artis, committed similar crimes in the same area and during the same time period as Buie's rape and murder; and (2) a statement to police by Mary McLean Richards that she witnessed Artis attack Buie the night Buie went missing. In addition to these *Brady*-based claims, Appellees further assert that Appellants violated their due process rights by (1) coercing a witness, L.P. Sinclair, to testify falsely; (2) coercing Appellees to confess; and (3) failing in bad faith to adequately investigate the crime.

---

[14] *Brady v. Maryland*, 373 U.S. 83 (1963).

Appellants moved for summary judgment as to Appellees' due process claims on the basis of qualified immunity. The district court denied summary judgment upon concluding that the facts, viewed in the light most favorable to Appellees, demonstrated that Appellants violated Appellees' clearly established due process right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." J.A. 322 (quoting *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014)).

Appellants assert that the district court's denial of summary judgment was erroneous because each of Appellees' due process claims fails as a matter of law. In the alternative, Appellants argue that even if they did violate Appellees' constitutional rights, the officers could have believed that their conduct was lawful because those constitutional rights were not clearly established by existing precedent. For the reasons that follow, we affirm the district court's denial of summary judgment as to Appellees' due process claims.

1.

*Claims for Suppression of Evidence*

Appellees allege that Appellants violated the *Brady* doctrine by suppressing two types of information that implicated Artis, rather than Appellees, as Buie's attacker: (1) evidence that Artis committed similar crimes in the same area and during the same time period as Buie's rape and murder, and that Appellants considered Artis a suspect in Buie's case; and (2) a statement to police by Richards that she witnessed Artis attack Buie the night Buie went missing. Appellants assert that neither type of evidence establishes a claim of a *Brady* violation as a matter of law.

37

a.

*Evidence Connecting Artis as a Suspect*

In *Brady v. Maryland*, 373 U.S. at 87, the Supreme Court held that the government's suppression of material exculpatory evidence violates the Due Process Clause. "Evidence is material if there is a 'reasonable probability that its disclosure would have produced a different result.'" *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (quoting *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013)). "This standard does not require a showing that a jury more likely than not would have returned a different verdict. Rather, the 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial,'" *id.* (quoting *Barkto*, 728 F.3d at 340), or the suppression "cast[s] serious doubt on the proceedings' integrity," *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 398 (4th Cir. 2014).

Unlike prosecutors, however, police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith. *Owens*, 767 F.3d at 396 & n.6, 401. Accordingly, as the district court correctly noted, Appellees' *Brady*-based due process claims hinge on the jury determining that Appellants suppressed material *Brady* exculpatory evidence in bad faith. Additionally, to prove a due process violation, Appellees must prove both but-for causation and proximate causation -- in other words, that the alleged wrongful act(s) caused Appellees' loss of liberty and the loss of liberty was a reasonably foreseeable result of the act. *See Massey*, 759 F.3d at 354–56; *Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012).

Appellants assert that they did not violate *Brady* by failing to disclose information linking Artis as a suspect of the crime because (1) Artis's criminal history and the facts of his conviction for Joanne Brockman's rape and murder were publicly available information; (2) the district attorney who prosecuted Appellees had also prosecuted Artis, so he was aware of Artis's criminal history; and (3) attorney Earl Strickland, a member of Appellees' defense team in their October 1984 trial, was also Artis's attorney in the August 1984 Brockman trial. As Appellants argue, this means that Artis's criminal history and the details of Artis's 1984 trial and conviction were well known to Appellees at the time of their first trial, and "there is no *Brady* violation where 'the defense already possesses the evidence.'" Appellants' Br. 57 (quoting *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011)). Further, Appellants argue that they did not suppress Artis's criminal history from the district attorney since he was already aware of it.

Appellants' arguments are unconvincing. Appellees' claim is not that Appellants should have turned over Artis's rap sheet, but that once the officers identified Artis as a suspect -- particularly in light of other evidence that pointed to Artis as the perpetrator of the crime -- they were obligated to disclose this exculpatory information. The fact that Artis's rap sheet was public information, the district attorney was aware of Artis's crimes, or that a member of the defense team was an attorney for Artis is not enough to disclose to Appellees that *the officers*, in the course of their investigation, recognized the similarities between Buie's murder and Artis's crimes and identified Artis as a suspect. Indeed, the fact that the same district attorney prosecuted Artis in a different rape and murder case does not mean that district attorney should have known that Artis was a suspect in Buie's rape

39

and murder. It is the officers' job to investigate the crime and identify suspects, not the prosecutor's. The same is true for Attorney Strickland: the connection between Artis and one of Appellees' counsel is not enough to show that Appellees possessed the relevant information about Artis. Even if Strickland noticed the similarities between the crimes, he had no way to know that Appellants had considered Artis a suspect in Buie's murder, which is the key evidence Appellants failed to disclose.

Accordingly, the district court did not err in denying Appellants' motion for summary judgment as to their failure to disclose evidence that Artis committed similar crimes in the same area and during the same time period as Buie's rape and murder, and that Artis was considered a suspect in the crime.

b.

*Richards's Statement*

As for Richards's statement to Detectives Sealey and Locklear that she had seen Artis attack Buie the night Buie went missing, we conclude that the evidence was clearly material, and a reasonable jury could conclude that it was suppressed by Appellants in bad faith. Indeed, the stark difference between what Richards alleges she told the officers and the two officers' interview notes supports the conclusion that if Appellees' allegations are true, this evidence was suppressed and obscured by Appellants. Neither set of interview notes from the officers mentions Artis, or the fact that Richards was an eye-witness to the crime. Instead, Detective Sealey's notes say Richards reported that she saw "three (3) Indian males at Hardin's Grocery at this time and one (1) of the Indian males was talking

rough to [Buie]," J.A. 1595, whereas Detective Locklear's notes indicate only that the interview generated "negative results," *id.* at 326.

Appellants argue that Appellees cannot establish a *Brady* violation on these facts because Appellants disclosed that they interviewed Richards, and Detective Sealey's notes indicated that Richards stated she had seen Buie shortly before the crime with "three (3) Indian males," one of which was "talking rough" to Buie. J.A. 1595. But viewing the facts in the light most favorable to Appellees, Sealey's notes egregiously mischaracterized the content of Richards's statement. This was insufficient to insulate Appellants from liability for a *Brady* violation, even if the fact of Richards's interview was disclosed.

Here, if Appellees' assertions are true, Appellants intentionally fabricated, obscured, and failed to disclose the most relevant and exculpatory evidence in the case: the statement from an eye-witness affirmatively identifying a *different suspect* as Buie's attacker. Accordingly, Appellees adequately alleged that Appellants failed to comply with their *Brady* disclosure obligations, and that they did so in bad faith.

2.

*Remaining Due Process Claims*

In addition to the *Brady*-based claims, Appellees raise three due process claims: (1) Appellants unconstitutionally coerced a witness, L.P. Sinclair, to testify falsely; (2) Appellees' confessions were unconstitutionally coerced (which violated Appellees' right to due process in addition to their Fourth Amendment rights); and (3) Appellants in bad faith failed to adequately investigate the crime. Appellants argue that each of these claims fails as a matter of law. For the reasons explained below, Appellants are incorrect.

41

a.

*Coerced, False Testimony by L.P. Sinclair*

Appellees assert that Appellants coached or coerced Sinclair to testify falsely, which Sinclair agreed to do only after Appellants identified Sinclair as a suspect and requested his fingerprints. As Appellees allege, "[t]his, combined with Sinclair's youth (age 16), along with the other evidence of [Appellants'] bad faith, suggest that Sinclair's statements were coerced or fabricated." Appellees' Br. 52 (citation omitted).

Viewing the facts in the light most favorable to Appellees, Appellants' assertion that Sinclair's testimony was voluntary as a matter of law is unsupported by the record. And whether any Appellants were present on October 5, 1984, when Sinclair changed his story to implicate McCollum, is a question of fact for a jury to determine.

b.

*Coerced Confessions by Appellees*

In its decision, the district court suggested that the use of Appellees' confessions, if coerced, may violate Appellees' rights to due process. To the extent Appellees assert a due process claim on this basis, Appellants' arguments that these confessions were voluntary as a matter of law fail for the same reasons explained above. Further, like the district court, we conclude that Appellees' incarceration was a clearly foreseeable result of the alleged fabrication of Appellees' confessions. Accordingly, if Appellees' allegations are true, they have demonstrated both but-for and proximate causation. *See Massey*, 759 F.3d at 354–56.

c.

*Failure to Adequately Investigate*

Finally, Appellees assert that Appellants violated Appellees' right to due process by failing to sufficiently investigate Artis and Sinclair in connection with Buie's rape and murder. This includes Appellants' failure to test whether Artis or Sinclair's fingerprints matched the latent print found on the beer can at the crime scene.

Appellants are correct that in general, there is no independent constitutional right to investigation of a third party. *See Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (stating that there is no constitutional right "as a member of the public at large and as a victim to have the defendants criminally prosecuted"); *see also Baker v. McCollan*, 443 U.S. 137, 146 (1979) (stating that law enforcement have no constitutional duty to "investigate independently every claim of innocence" or "perform an error-free investigation"). However, Appellees do not state a claim based on an independent right to an investigation, but rather that Appellants' failure to investigate was a result of their bad-faith suppression of evidence. Indeed, the district court concluded that Appellees' claims could establish a due process violation *if* the jury concluded that Appellants' actions after Appellees' arrests -- including failing to adequately investigate Artis and the crime scene and failing to disclose exculpatory evidence -- were done in bad faith in order to shield Appellants' wrongful acts related to Appellees' coerced or fabricated confessions. We find no error in the district court's conclusion.

### 3.

*Whether the Constitutional Rights were Clearly Established*

Finally, Appellants challenge the district court's denial of summary judgment by asserting that even if they violated Appellees' due process rights, "the officers are entitled to summary judgment because, given the existing case law during the relevant time period, it was not 'beyond debate' that the specific actions taken by the officers violated the Constitution." Appellants' Br. 70 (citation omitted). This is the full extent of Appellants' argument on this point. Appellants include no explanation for how they believe the district court erred.

But there can be no reasonable dispute, as the district court correctly concluded, that it was clearly established in 1983 that an individual has a constitutional right not to be deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer. *See Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (holding that it was clearly established in 1982 that when police intentionally withhold or destroy evidence, or otherwise act in bad faith, their actions violate the due process rights of a criminal defendant). The same is true for an individual's constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer. *See Washington v. Wilmore*, 407 F.3d 274, 283–84 (4th Cir. 2005) (holding that officer's alleged fabrication of evidence, if true, violated clearly established constitutional right). Finally, as the district court concluded, "it has long been established that when law enforcement acts in reckless disregard of the truth and makes a false statement or material omission that is necessary to a finding of probable cause, the resulting seizure will be

determined to be unreasonable," J.A. 317 (citing *Franks v. Delaware*, 438 U.S. 154, 157 (1978)), and "it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," *id.* (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

It was beyond debate at the time of the events in this case that Appellees' constitutional rights not to be imprisoned and convicted based on coerced, falsified, and fabricated evidence or confessions, or to have material exculpatory evidence suppressed, were clearly established.

## IV.

For all of the reasons detailed herein, the district court did not err in denying summary judgment to Appellants. The judgment of the district court is

*AFFIRMED.*

RICHARDSON, Circuit Judge, concurring in part and dissenting in part:

I agree that the Plaintiffs' Fourth Amendment claims should survive summary judgment and that their Fifth Amendment claims arising from their confessions and Mary Richards's statement should likewise go to trial. However, on the remaining due process claims—the officers' failure to investigate Artis, the coercive questioning of Sinclair, and the failure to disclose their impressions of Artis as a suspect—the Plaintiffs fail to articulate the violation of a constitutional right. And even if they could, these alleged due process rights were not clearly established in 1983. I would therefore reverse on these remaining Fifth Amendment claims.