**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 24-2143**

─────────

KENNETH MCPHERSON; ERIC SIMMONS,

> Plaintiffs – Appellants,

> v.

DETECTIVE ROBERT PATTON; DETECTIVE FRANK BARLOW,

> Defendants – Appellees,

> and

BALTIMORE POLICE DEPARTMENT; UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT; STATE'S ATTORNEY,

> Defendants.

─────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge. (1:20−cv−00795−SAG)

─────────

Argued:  October 23, 2025                                          Decided:

─────────

Before DIAZ, Chief Judge, and WYNN and BERNER, Circuit Judges.

─────────

Vacated in part, affirmed in part, and remanded by published opinion. Chief Judge Diaz wrote the opinion in which Judge Wynn and Judge Berner joined.

─────────

**ARGUED:**  Gayle Horn, LOEVY & LOEVY, Chicago, Illinois, for Appellants. Michael Patrick Redmond, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland,

for Appellees.  **ON BRIEF:**  Jon Loevy, Renee Spence, Roshna Bala Keen, LOEVY & LOEVY, Chicago, Illinois, for Appellants.  Ebony M. Thompson, City Solicitor, Matthew O. Bradford, Chief of Staff, Kara K. Lynch, Office of Legal Affairs, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

———————————

DIAZ, Chief Judge:

In 1995, a Maryland state jury convicted brothers Kenneth McPherson and Eric Simmons of conspiring to murder Anthony Wooden. Over twenty years later, a Baltimore circuit court vacated their convictions after the State's Conviction Integrity Unit filed a petition with the brothers for a writ of actual innocence.

McPherson and Simmons then sued the Baltimore Police Department and five detectives, asserting various constitutional and state-law claims, including fabrication and suppression of evidence under 42 U.S.C. § 1983. The district court dismissed the claims against all but two defendants, detectives Robert Patton and Frank Barlow.

Patton and Barlow moved for summary judgment. During a hearing on the motion, the district court raised an evidentiary issue about the admissibility of witness Marcus King's state trial testimony. King, now deceased, allegedly participated in the murder conspiracy and gave a statement to Patton and Barlow implicating the brothers that he later recanted at their trial. The district court excluded the testimony and granted Patton and Barlow's summary judgment motion.

McPherson and Simmons argue on appeal that the district court erred in excluding King's testimony as inadmissible hearsay and in dismissing their § 1983 and associated state-law claims. We agree, and so vacate the district court's judgment and remand for further proceedings.

3

I.

A.

Just after midnight on August 31, 1994, Anthony Wooden was shot and killed during an exchange of gunfire. The police found Wooden's body near the intersection of North Washington Street and Federal Street in Baltimore. Detectives Patton and Barlow investigated the murder and interviewed potential witnesses.

The detectives spoke to three witnesses the night of the murder: James Martin, Crystal White, and Sandra Jackson. Detective Patton spoke with Martin and prepared a handwritten note summarizing the interview. In it, Patton wrote that Martin "heard 3 shots" and "saw [Wooden] running up the street with [a] bag on [his] shoulder." Joint Appendix (J.A.) 6934. Martin saw "[Wooden] shooting back" at someone before "fall[ing]." J.A. 6934. Martin also saw a "second person standing at [the] [northeast] corner of Federal and Washington," who "sho[t] back at [Wooden]," but "a pick-up truck was blocking [Martin's] view." J.A. 6934.

Detective Barlow spoke with White and Jackson and took several pages of handwritten notes. White, who was two blocks away from the shooting, saw two men facing one another at the corner of Federal and Washington Streets; the shooter had his arms out with a gun pointed at Wooden. She then heard multiple volleys of gunfire before seeing Wooden fall and the shooter flee.

Jackson, who was around the corner from the shooting, told Barlow that in the minutes before she saw three men meet two others at the intersection of Federal and Washington Streets and pass a gun between them. The two men began running north on

4

Washington before crossing onto Federal, and one man began firing a gun. Jackson heard four shots before seeing one man run from the intersection with a gun. She gave Barlow descriptions of several men involved.

In an undated, one-page "[f]ollow up" note, Patton memorialized additional information he obtained from Jackson. J.A. 6933. Patton wrote that Jackson could identify the person who ran from the scene with a gun because he had robbed her niece about a week earlier and "frequent[ed] the area of Montford and [F]ederal Streets." J.A. 6933.

Neither the one-page note summarizing Martin's interview, nor the follow-up one about Jackson, appeared to make it into the case file.

## B.

The next day, Diane Bailey and her daughter, Keisha Thompson, told the detectives that they had witnessed Wooden's murder. Bailey, who had a criminal history, had also witnessed an unrelated murder the previous year and was cooperating with law enforcement in that case in exchange for some state benefits.

Bailey and Thompson were in their Washington Street third-floor apartment watching television when they saw five men gather on the street minutes before the shooting.[1] The five men, who Bailey and Thompson identified largely by their nicknames, included Nicholas Richards ("Country"); Daniel Ellison ("Whitey"); McPherson ("JR"); Simmons ("Black"); and eventual trial witness, Marcus King.

---

[1] The detectives interviewed Bailey and Thompson together and typed their summary, referring to Bailey as the "witness" or "Witness" and Thompson as "her daughter." *See, e.g.*, J.A. 7137.

5

According to Bailey and Thompson, the women were by their open window when they heard McPherson tell King to "go get the guns, go get the guns." J.A. 7135. King returned "two to three minutes later" with a brown paper bag, out of which McPherson, Richards, and Ellison each pulled guns. J.A. 7135–36. Simmons was also armed. Then, Richards yelled at three other men (including Wooden) who had turned on Washington Street near Federal Street. Wooden had a bag on his shoulder.

After Richards yelled at them, the group began running back up the street, with Richards, Ellison, McPherson, Simmons, and King in pursuit. At some point, Richards, Ellison, McPherson, and Simmons started shooting at Wooden's retreating group. The "next thing" that Bailey and Thompson saw was Richards, Ellison, McPherson, Simmons, and King running back down the street towards their original meeting place before dispersing. J.A. 7137.

Bailey didn't realize "that anyone was killed until the next day" when she heard someone say "that 'Country' had shot and killed a boy down on Federal and Washington Street" the night prior. J.A. 7137. Bailey and Thompson gave the detectives descriptions of, or addresses for, Richards, Ellison, McPherson, Simmons, and King.

## C.

Bailey and Thompson identified Richards ("Country") and King in a photographic lineup. They did the same for McPherson and Simmons.

Between these photo identifications, and using the evidence they'd already gathered, law enforcement arrested Richards, Ellison, and King. They also searched

6

McPherson and Simmons's home and arrested the brothers after finding 502 cocaine vials, 118 heroin vials, and a handgun.

On September 6, 1994, the police brought King to the homicide office at about 7:20 a.m. and placed him in handcuffs and leg irons. King was then thirteen years old and had learning disabilities. Because King was a minor, Patton and Barlow invited King's mother to join the interview, which began around 11:50 a.m.

Patton and Barlow didn't record the first part of the interview. During this unrecorded portion, King denied any involvement in Wooden's murder. He also denied McPherson and Simmons's involvement.

Patton yelled at King to tell the truth and stood and banged on the desk in front of King. Patton admonished King that he had witnesses who told him that King retrieved a bag of guns, and that he wouldn't end the interview until King told "the truth about what had happened." J.A. 545. King began to cry.

Patton and Barlow later began recording King's interrogation. By that time, King had changed his story. He admitted that along with Richards, Ellison, McPherson, and Simmons, he participated in the murder. His statement generally corroborated Bailey's account.

For their part, McPherson and Simmons denied that either of them (or King) participated in the shooting and offered alibis. Ellison, meanwhile, admitted that he saw the murder and that others were involved, but he denied that McPherson and Simmons were among them.

After the interrogations, Patton meant to follow up with Jackson. But he couldn't reach her.

### D.

A state grand jury indicted Richards, Ellison, McPherson, and Simmons for murder and conspiracy to commit murder. Ellison pleaded guilty, but the remaining defendants proceeded to a joint trial.

Before trial, King recanted his recorded testimony and, at varying times, exculpated McPherson and Simmons. Assistant State's Attorney Sharon Holback, who prosecuted the case, disclosed to the trial court that King had recanted.

Still, Holback was confident enough that King would stick with the version of events supporting the State's case that she called him as her first witness. But King again recanted his recorded statement and testified, as he had said in the unrecorded part of his interrogation, that neither he nor McPherson and Simmons participated in the murder. King added that the detectives "forc[ed]" him to lie and admit his and the brothers' involvement.[2] J.A. 420.

Chaos ensued. Richards's attorney told the trial court that King's examination had turned into "a junior high school fight," J.A. 505, and he repeatedly moved for a mistrial. But the attorneys, including Holback, continued questioning King.

King's testimony was disjointed and confusing, exacerbated by frequent objections from the attorneys and interruptions from the trial court. But King remained firm that

---

[2] Yet King did testify that Richards and Ellison were involved in the murder.

McPherson and Simmons took no part in the murder and that any statement to the contrary "wasn't true." J.A. 469.

After King's testimony, the State introduced and played King's recorded statement, and Bailey and Patton testified. Defense counsel attempted to impeach Bailey and offered several alibi witnesses.

The jury sided with the State and convicted McPherson and Simmons of conspiracy to murder, though it acquitted them of the murder charges. The brothers received life sentences.

## E.

Over two decades later, McPherson and Simmons contacted the State's Attorney's Conviction Integrity Unit and claimed their innocence. By then, King and Bailey had both died.

The Unit investigated the brothers' claims and recommended that the State move for a writ of actual innocence. Together, the State and the brothers did just that, submitting a joint petition for a writ of actual innocence, which the state court granted.[3]

After their release, McPherson and Simmons sued Patton, Barlow, and three other detectives in federal court under 42 U.S.C. § 1983. The brothers alleged, as relevant here, that the detectives violated their due process rights "through fabrication of evidence and

---

[3] The state court expressed some "skepticism that the parties had presented newly discovered evidence," a requirement for actual innocence under Maryland law. *McPherson v. Balt. Police Dep't*, No. SAG-20-0795, 2023 WL 5433011, at *11 (D. Md. Aug. 3, 2023). Still, it granted the petition.

the deliberate withholding of exculpatory evidence." *McPherson v. Balt. Police Dep't*, No. SAG-20-0795, 2023 WL 5433011, at *11 (D. Md. Aug. 3, 2023).

They claimed that the detectives fabricated evidence by "fe[eding] King facts about the crime during his [recorded] interview in order to get him to adopt those facts into a statement they knew was false." *Id.* at *19. And McPherson and Simmons asserted that the detectives suppressed Patton's exculpatory handwritten note about Martin's eyewitness account and his handwritten "[f]ollow up" note about Jackson's account, violating *Brady v. Maryland*, 373 U.S. 83 (1963).

The district court dismissed the claims against all the detectives but Patton and Barlow.

The court then heard argument on Patton and Barlow's subsequent summary judgment motion. During the hearing, the court asked about the admissibility of King's trial testimony given that he was now dead. The parties submitted supplemental briefing on the issue.

The district court granted the detectives' summary judgment motion in a written opinion. The court began by noting that it would "focus[] its analysis on the potential evidence demonstrating alleged misconduct by [Patton and Barlow]," not on the "ample evidence" McPherson and Simmons provided "regarding their innocence." *McPherson*, 2023 WL 5433011, at *12.

The district court turned next to the admissibility of King's trial testimony. The court concluded that the testimony was inadmissible hearsay, not subject to any exceptions in Federal Rules of Evidence 804(b)(1) or 807. The court likewise would have found that

10

Bailey's trial testimony too was inadmissible, but since neither party objected to its admissibility, it "consider[ed]" her testimony "for the purposes of [the summary judgment] motion." *Id.* at *15–16.

The district court next turned to the substance of the brothers' § 1983 fabrication and suppression claims. The district court rejected them (and the other federal and state-law claims), pointing mostly to the speculative nature of McPherson and Simmons's evidence. *Id.* at *17–28.

This appeal followed.

## II.

We review the district court's grant of summary judgment de novo. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). "We view the evidence in the light most favorable to the [non-movants]; we draw all reasonable inferences in [their] favor; and we do not weigh the evidence or make credibility calls, even if we do not believe [the non-movants] will win at trial." *Id.* Given that, "we can only grant summary judgment where no material facts are genuinely disputed." *Id.*

11

III.

McPherson and Simmons contend that the district court (1) abused its discretion by excluding King's trial testimony;[4] and erred by dismissing their (2) fabrication and (3) suppression claims.  We agree with the brothers on their first two arguments but reject the third.  Thus, we vacate in part, affirm in part, and remand for further proceedings.

A.

We'll begin with the district court's exclusion of King's trial testimony, in which King claimed that the detectives coerced him into giving false evidence.  The parties agree that King, now deceased, is an unavailable witness.  So to admit his prior testimony, McPherson and Simmons must show that it satisfies a hearsay exception.

The brothers invoke Federal Rules of Evidence 804(b)(1) and 807.  We start and finish with Rule 804(b)(1).

1.

"Federal Rule of Evidence 804(b)(1) permits the introduction of testimony given as a witness at another hearing if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." *Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc.*, 71 F.3d 119, 127 (4th Cir. 1995) (citation

---

[4] McPherson and Simmons also appeal the district court's exclusion of Bailey's trial testimony.  But the court considered it for the summary judgment motion, which is the final order we're considering now.  Patton and Barlow argue for that reason that the "issue is not before [us]," and the brothers don't challenge that conclusion.  Appellees' Br. at 1. We'll let sleeping dogs lie.

12

modified). "When reviewing the admissibility of evidence pursuant to Rule 804(b)(1), we focus on the similarity of motives between the predecessor in interest and the one against whom the testimony is now offered." *Id.* (citation modified). "When the motives differ, the testimony may not be introduced." *Id.* (citation modified).

Even so, "the party against whom the testimony was admitted in the prior proceeding need only have had a similar motive, not an identical motive, to the party in the second proceeding." *Id.* (citation modified). In applying that standard, we consider whether the relevant parties had a "substantially similar" motive, or if the questioning in the respective proceedings shared the same "dominant motive." *Id.*

We review the district court's evidentiary decision for abuse of discretion and its underlying factual findings for clear error. *Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008).

2.

To prevail on this claim, McPherson and Simmons must show that the motive that Patton and Barlow's counsel would have had when questioning King in a civil action today is similar to the one Holback had when she questioned King during the criminal trial in 1995.

At first glance, the *dis*similarities leap off the page. Holback, initially at least, called King to identify McPherson and Simmons as participants in a murder. Patton and Barlow's counsel, by contrast, would question King to discredit claims that the detectives fabricated evidence in investigating that murder. One witness examination occurred in a criminal

13

trial on state homicide charges; the other would occur in a civil trial on federal constitutional claims. Add to this that over twenty years would separate the proceedings.

But courts take more than a first glance, and here, King's recantation makes all the difference. When that happened, Holback attempted to rehabilitate King—or at least bolster the credibility of his recorded statement—and, in doing so, attempted to defend the interrogation that produced the statement.

We needn't look any further than the state trial transcript to gauge Holback's motives. After King recanted, she asked him about his arrest and interrogation, including whether the detectives "advised [him] of [his] constitutional rights" before they began questioning. J.A. 8316; *see also* J.A. 8326. She clarified whether the detectives forced King to lie "while [his] mother was there," and whether King recalled if the detectives recorded the interview. J.A. 8316. She also asked King to identify the detective in the courtroom who "made [him] tell a lie in front of [his] mother," J.A. 8323, and confirmed that the detectives had King acknowledge (and initial a form confirming) that they had read him his *Miranda* rights.[5]

Along these lines, Holback repeatedly questioned King about the alleged lies the detectives made him tell, whether they made him do so in his mother's presence, and whether they did so only after they had "given [him] [his] *Miranda* rights." J.A. 8335 (italics added). King responded consistently that the detectives told him that his statements

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 467–73 (1966).

14

denying his (or McPherson and Simmon's) involvement "weren't true" and that they made him "say stuff out of [his] mouth [that] [wasn't] true." J.A. 8336–37.

Holback also asked King if the detectives had told King what to say or if someone else had; if Barlow had screamed at him; and if he had told the detectives at any point during the recorded statement that his account wasn't true. She so persistently asked King to clarify his responses to these questions that the trial court told Holback to "not try to dig [into] the same thing over and over again." J.A. 8345.

On redirect, Holback returned to the detectives' conduct. She asked King how long the detectives questioned him before "they turned on the tape recorder," J.A. 8381, and whether Patton had told King that he'd "be locked up" if he "lie[d] under oath" on the witness stand, presumably by testifying differently than his recorded statement. J.A. 8388.

In sum, at trial, King (1) recanted his recorded statement incriminating McPherson and Simmons and (2) testified that the detectives made him lie in the recorded statement and resorted to screaming at him to elicit it. As evidenced by her line of questioning to King, Holback knew that she needed to do more than simply affirm the veracity of the State's first witness's recorded statement. She also had to defend the integrity of the investigation and the detectives who carried it out.

That explains why Holback had King confirm—repeatedly—that the detectives questioned him only after they read him his constitutional rights and ensured his mother was present. It also explains why Holback asked King—repeatedly—who made him lie, and why she dug into the specifics of the interrogation, including how long the detectives

15

questioned King before turning on the tape recorder; what the detectives screamed at him; and who gave him the information to say during his recorded statement.

Although we have great respect for the distinguished district court judge, we hold that her findings as to Holback's motive constitute clear error. The district court concluded that Holback "did not have to rehabilitate the [detectives'] credibility to, in her mind, protect the public and secure a just result in [McPherson and Simmons's] criminal trial." *McPherson*, 2023 WL 5433011, at *14. "Her focus," said the court, was in "prov[ing]" that King's recorded statement "was true," not in proving that the detectives didn't "know that [it] was false." *Id.*

The district court also reasoned that Holback acknowledged in a later deposition that "King's unexpected recantation caught her off guard," "so she was not able to prepare any questioning regarding his fabrication allegations." *Id.* Thus, it was "[a] reasonable litigation strategy . . . to minimize the extent of King's direct examination and instead focus on introducing his taped statement." *Id.* Taken together, explained the district court, "[n]obody at the criminal trial was looking out for the [detectives'] interests and trying to prove they acted in accordance with the law." *Id.*

But Holback *was* concerned with proving that the detectives acted lawfully because she ensured the jury heard, at bottom, that Patton and Barlow *Mirandized* King before questioning him and allowed his mother in the room with him. She also made sure the jury knew that the detectives had King acknowledge his rights in writing before he gave any statement.

16

And though not part of King's examination, Holback asked Patton on direct to explain what purpose his interrogative techniques—like handcuffing and shackling King, yelling at him, and banging on the desk—served in questioning King. Then Holback emphasized in closing that Patton was "a diligent, intelligent, professional, dedicated human being who wanted to solve this murder." J.A. 8916. "[I]f [that] meant banging on the table and saying, 'Marcus let your conscience be your guide, tell the truth,'" then Holback "applaud[ed] that." J.A. 8916–17.

In short, the common threads from King's examination to Patton's examination to Holback's closing were to convey both Patton's and his investigation's integrity.

Those threads also cut against the district court's other proffered reasons for distinguishing Holback's motive in questioning King then from what would be Patton's and Barlow's motive in questioning him now.

The district court concluded that Holback was shocked by King's recantation, so it was a reasonable litigation strategy for her to minimize King's direct examination and focus on introducing his recorded statement. To be sure, Holback said in a deposition for this civil case that she "remember[ed] being shocked when Marcus King came up with a new story on the witness stand," in part because he had "just" reviewed his recorded statement before the trial and said that it "was correct." J.A. 3321.

But it beggars belief that Holback could have been so shocked when King recanted at trial. After all, she knew that King had previously recanted his recorded statement and disclosed as much to the trial court. The trial court even remarked that King had "flip-flopped several times" in his account. J.A. 474.

17

Moreover, Holback clarified later in the deposition that she wasn't shocked "so much that [King] recanted entirely," but was more shocked by "his demeanor, his calm, his cool" when recanting. J.A. 3361; *see also* J.A. 3370 ("What was unusual was the sophistication that this kid who wasn't acting like a kid displayed in court, the cool, calm, deliberate, assured [demeanor].").  So the record doesn't bear out that Holback was so caught off guard by King's recantation that she couldn't question him about the alleged fabrication.  Indeed, Holback did question King on that point.

Perhaps it would have been a better litigation strategy to minimize King's testimony and rely on his recorded statement.  But that's not the strategy Holback employed.

Patton and Barlow argue that Holback was merely satisfying the standard for admitting King's recorded statement as a prior inconsistent statement under Maryland law when she asked King about the circumstances of his interrogation.  And the state trial court acknowledged that Holback had satisfied the State's burden.  Had she stopped there, we might be inclined to agree with the detectives.

But this minimize-the-damage position falls flat because Holback continued her examination even after that point.  She repeatedly asked King the same questions—who had told him what to say and when; whether the detectives had *Mirandized* him; whether his mother was present during the interrogation; what the detectives' reactions were when he denied McPherson and Simmons were involved in the murder; and what the detectives screamed at him—after the trial court suggested that it would admit the recorded statement.

All said, the "reasonable litigation strategy" that Holback "could have" pursued was not the one the record reflects.  *McPherson*, 2023 WL 5433011, at *14.

18

3.

The "similar motive" analysis is "inherently a factual inquiry" that gauges "the similarity of the underlying issues and . . . the context of the . . . questioning." *United States v. Salerno*, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring) (emphasis omitted). But importantly, this "similar motive" need not be an "identical one." *Marlinton*, 71 F.3d at 127 (quoting *Salerno*, 505 U.S. at 326).

King—a young boy with learning disabilities—was an imperfect trial witness. There are also no doubt differences between the questions King faced in the 1995 criminal trial and those he would face today in a civil trial.[6] But considering that King recanted his recorded statement and alleged the detectives made him lie, and that Holback questioned him extensively about those allegations and the underlying interrogation, we're satisfied that the overlap is enough. The prosecutor then and defense counsel now "ultimately share[] a similar incentive to elicit [King's] understanding" of the alleged fabricated evidence. *Wellin v. Farace*, No. 2:16-cv-00414-DCN, 2022 WL 17811722, at *10 (D.S.C. Dec. 19, 2022).

We hold that the district court abused its discretion in excluding King's testimony under Rule 804(b)(1).

---

[6] McPherson and Simmons argue that the district court imposed a "categorical bar to the use of criminal trial testimony in civil cases." Appellants' Br. at 21. We disagree. The district court weighed the persuasiveness of two cases, one a criminal case, the other civil, and remarked that "[p]rosecutors in criminal trials have different motives and priorities than defendants in a subsequent civil trial." *McPherson*, 2023 WL 5433011, at *14. The court's reasonable observation was not dispositive given that the court didn't end its analysis there.

19

B.

With King's trial testimony in the mix, we address the substance of McPherson and Simmons's fabrication claim. In doing so, we find a triable factual issue better suited for a jury.

1.

"The Fourteenth Amendment protects against deprivations of liberty accomplished without due process of law." *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (citation modified).[7] We've held that an investigating officer's fabrication of evidence can violate a person's due process rights. *See, e.g.*, *Washington v. Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005). And we've in turn recognized that an investigating officer fabricates evidence when he coerces a witness into providing false testimony. *See Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019).

But the plaintiff must prove that the investigator fabricated the evidence "deliberately or with a reckless disregard for the truth." *Massey*, 759 F.3d at 357 (citation modified). The plaintiff may do so by showing that the investigator "entertained serious doubts as to the truth of [the] statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (citation modified).

---

[7] It's elementary then that a party alleging a fabrication claim must show that the fabrication caused a deprivation of liberty. *Washington v. Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005). Patton and Barlow never argued that McPherson and Simmons failed to make this showing, so we assume they did. We also find that there's good reason to think King's fabricated statement (accepting that it was fabricated), which the State introduced and which Bailey corroborated at trial, caused the jury to convict the brothers.

This is true even where the plaintiff pleads fabrication through coerced testimony. Coercion alone isn't sufficient for a due process fabrication claim; the coerced testimony must indeed be fabricated, or false, and the defendant must know (or should have known) that it was. *See, e.g.*, *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (distinguishing coercion and fabrication and explaining that "coercion . . . may be an essential tool in 'persuading' a witness to fabricate testimony").

McPherson and Simmons must show that Patton and Barlow[8] deliberately, or with reckless disregard for the truth, manufactured false testimony from King in his recorded statement. The brothers allege exactly that: King's trial testimony creates a triable issue of fact about whether the detectives coerced King into falsely inculpating McPherson and Simmons.

They direct us to several pieces of evidence in support. First, they point to King's trial testimony.

Recall that King repeatedly told Holback and the state trial court that after he denied his and the brothers' involvement in the crime, the "policeman" or the "detective" "was trying to make [him] say stuff out of [his] mouth [that] [wasn't] true." J.A. 8336–37. King added that the "police officer" told him that, "yes," the brothers did have something to do with the murder. J.A. 8343–44. According to King, he got "upset" by the detective's

---

[8] The brothers bring the fabrication claim against Patton and Barlow. Yet Patton seems most implicated here. After all, he conducted King's witness interview; he yelled at King and jumped and banged on the table; and he admonished King to tell the truth. But Barlow doesn't challenge on appeal that the fabrication evidence is insufficient as to him. So again, we'll let sleeping dogs lie.

comments "because [he] didn't want to lie and [the detective] kept making [him]." J.A. 8334–35.

What's more, King testified that Patton, while attempting to persuade King to change his story, yelled at him and made him cry. Patton admitted that he yelled at King, jumped and banged on the desk, and threatened not to end the interrogation until King told the "truth" by incriminating himself, McPherson, and Simmons. The record also shows that, before Patton and Barlow interviewed thirteen-year-old King, they held him for four-and-a-half hours while handcuffed and shackled.

In the light most favorable to McPherson and Simmons, King's testimony supports that (1) King first denied his and the brothers' involvement in the unrecorded portion of the interrogation; (2) he changed his story in the recorded portion after Patton berated him and made him "say stuff out of [his] mouth" about his and the brothers' involvement, J.A. 440; and (3) this new version of events was a "lie." J.A. 427.

There's no doubt that King was a flawed witness. At times, he suggested that "Whitey" (or Ellison, who pleaded guilty) was the one who told him "what happened" the night of the murder. J.A. 445. At other times, he insisted that "[n]obody," seemingly including the detectives, "told [him] [what] to put on the tape." J.A. 445.

So one could conclude that McPherson and Simmons's fabrication claim may not be a slam dunk at trial. But the claim surely creates a triable issue.

### 2.

The circumstantial evidence that McPherson and Simmons cite confirms this conclusion. They point out, for example, that Patton acknowledged he told King non-

public facts about the crime during the unrecorded part of the interrogation, including that he had witnesses who reported that King retrieved multiple guns out of a bag before the murder. The brothers also posit that "the drastic evolution of [King's] statement, from denial to inculpatory, during his coercive interrogation" allows us to infer fabrication. Appellants' Br. at 48; *see also Osborne v. Georgiades*, No. CV RBD-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), *aff'd,* 679 F. App'x 234 (4th Cir. 2017) (allowing jury question on fabrication in part where victim shifted story from denying plaintiff's involvement to implicating plaintiff during police interview).

Then, to show the falsity of King's recorded statement, as well as the detectives' knowledge of the same, McPherson and Simmons attack Bailey's police statement as unreliable if not impossible. Bailey initially told police that she heard McPherson tell King to "get the guns," J.A. 7135; saw King walk across the street and return with a bag; saw Richards, Ellison, and McPherson take guns out of the bag; and then saw Richards, Ellison, McPherson, Simmons, and King run up Washington Street, start shooting, and run away. And she saw all this from her third-floor apartment's open window, in the middle of the night, while watching television.

King's recorded statement largely mirrors Bailey's, including the details about his and the brothers' involvement. Patton testified that, in his view, Bailey's version of the events was the "truth," J.A. 5609, so he "knew" King was lying because King's account didn't accord with Bailey's, J.A. 5623.

But McPherson and Simmons argue that the detectives at least recklessly disregarded the actual truth in relying on Bailey's statement and then feeding it to King,

23

including those non-public facts. In other words, the brothers contend that the detectives had "serious or obvious reasons to doubt the truth or accuracy of the reported information." Reply Br. at 8 (citing *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007)).

McPherson and Simmons also point to their alibi evidence, Ellison's exculpatory statement, and the fact that Bailey was receiving state benefits for testifying in this case (and in another) and had criminal convictions for dishonest conduct, all of which the detectives knew or should have known.

Finally, the brothers benefit from the Conviction Integrity Unit's memorandum supporting their actual innocence claim. In it, the Unit cast serious doubts on Bailey's statement and whether her observations were even "possible." J.A. 11176. The Unit investigated the crime scene (albeit over twenty years later) and concluded that the shooting occurred outside of Bailey's view and that, while it was "possible" that Bailey heard someone yelling, it wasn't possible that she could have discerned the "*actual* words." J.A. 11179. The Unit explained that it was plausible Bailey saw and identified McPherson and Simmons from her window *after* hearing gunshots, but it ruled out that she did so before the shooting, which matched the brothers' own alibi evidence.

Bailey's and King's statements are the only evidence incriminating McPherson and Simmons and are corroborated only by each other. So if there is reason to doubt the veracity of Bailey's statement, the same holds true for King's recorded statement. All told, we're satisfied that McPherson and Simmons have shown sufficient evidence of fabrication.

24

In arguing otherwise, Patton and Barlow point us to the Ninth Circuit's en banc decision in *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001). There, the court affirmed the summary judgment dismissal of a fabrication claim based on a child witness's testimony. *See id.* at 1076.

The witness initially denied during her police interview that Devereaux sexually abused her before changing her story and saying that he did. *Id.* at 1073. The officer "aggressive[ly]" questioned the witness and "repeatedly admonished [her] to tell the truth" before she accused Devereaux of abuse. *Id.* at 1077. As the court explained, "[i]t is difficult to see . . . how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence." *Id.*

We agree, but the rest of the court's explanation illustrates the difference here. Devereaux, for instance, "never even alleged facts of [the] sort" that "the interviewer knew or should have known that the alleged perpetrator was innocent." *Id.* Nor did Devereaux allege "that the interviewer knew or should have known that [his interview tactics] would yield false information." *Id.* McPherson and Simmons made those arguments and alleged those facts.

We repeat: those arguments may not win the day at trial.  But they're enough to survive summary judgment.[9]

C.

We reach a different conclusion for McPherson and Simmons's suppression claim related to the two single-page, handwritten notes about eyewitnesses Martin and Jackson.

1.

"[T]o make out a claim that an officer violated one's constitutional rights by suppressing exculpatory evidence, [a plaintiff] must prove that (1) the evidence at issue was favorable to him; (2) the officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Burgess v. Goldstein*, 997 F.3d 541, 550 (4th Cir. 2021).

"Evidence is material" and thus prejudicial "if there is a reasonable probability that its disclosure would have produced a different result." *Gilliam*, 932 F.3d at 238 (citation modified).  This reasonable probability standard doesn't "require a showing that a jury more likely than not would have returned a different verdict." *Id.* (citation modified). Instead, a plaintiff need only show that "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (citation modified).

---

[9] In a footnote, Patton and Barlow argue in the alternative that they're entitled to qualified immunity.  That's wrong.  As we explain below, making an argument in a footnote generally waives the argument, *infra* Section C.2, and failing to raise an argument to the district court generally forfeits it, *Sines v. Hill*, 106 F.4th 341, 349 & n.6 (4th Cir. 2024).  The detectives raised qualified immunity to the district court for other dismissed claims, *McPherson*, 2023 WL 5433011, at *26, but didn't for the fabrication claim.  In any event, we decline to address their argument on appeal.

2.

We'll start with bad faith because the parties dispute whether McPherson and Simmons sufficiently raise it.

It matters that the brothers bring their claims against police officers rather than a prosecutor. "[T]he prosecution's suppression of evidence that is favorable to an accused 'violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Burgess*, 997 F.3d at 550 (quoting *Brady*, 373 U.S. at 87); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 n.6 (4th Cir. 2024).

But "[u]nlike prosecutors, . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238. So we've recognized that "*Brady*-based due process claims [against police officers] *hinge* on the jury determining that [the officers] suppressed material *Brady* exculpatory evidence in bad faith." *Id.* (emphasis added).

Despite this burden, the brothers' bad faith argument appears in their opening brief in a single sentence, in a single footnote. They note that the district court assumed bad faith and assert that "[b]ad faith can be inferred from the failure to disclose [the] evidence given its exculpatory value," citing two unpublished district court decisions. Appellants' Br. at 60 n.14 (citing *Shipley v. Disney*, No. CV SAG-21-3173, 2022 WL 2789076, at *6 (D. Md. July 15, 2022); *Johnson v. Balt. Police Dep't.*, No. CV ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020)).

27

It's true that the district court assumed bad faith, but that doesn't absolve McPherson and Simmons from meeting this necessary element. We routinely hold that a plaintiff waives an argument on appeal by raising it only in "an isolated footnote" in his opening brief. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015); *see also Miranda v. Garland*, 34 F.4th 338, 350 (4th Cir. 2022) (remarking that "such scant treatment" of an issue by relegating it to a footnote normally "would constitute waiver," but addressing argument because it affected the court's jurisdiction).[10] That's all McPherson and Simmons did here.

Even so, we'll accept that the brothers raised the bad faith issue. They assert that "a jury could infer that [Patton and Barlow] understood the exculpatory value of the notes and suppressed them in bad faith" because they knew the notes "would undermine Bailey's story" and identify Wooden's single shooter. Reply Br. at 18.

That argument leans on the materiality of the allegedly suppressed evidence, another element of a *Brady* claim. We'll turn to that now because it's a sufficient basis to reject the brothers' claim.

3.

Martin told the detectives that he saw Wooden running up the street and shooting at a second person who returned fire. But Martin admitted that a pick-up truck blocked his view. Jackson said that the person she saw running from the shooting with a gun was the

---

[10] McPherson and Simmons contend exactly this in their own reply brief about Patton and Barlow's eleventh-hour qualified immunity argument. *See* Reply Br. at 1 n.1 (citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009)).

28

same person who robbed her niece about a week before. She gave her niece's contact information and said that "she" (presumably her niece) could identify the person with a gun.

But as the district court concluded, the jury didn't convict McPherson and Simmons as Wooden's shooters; instead, it convicted them as co-conspirators to murder, so identifying the shooter wouldn't exculpate them. Jackson's initial statement only emphasizes that point: she "identified at least five people present," so "[t]he fact that the shooter was not either [McPherson or Simmons] says nothing about the identity of the remaining four." *McPherson*, 2023 WL 5433011, at *23.

In their statements, Martin and Jackson identify one person with a gun.[11] But that evidence doesn't exclude the possibility that multiple people fired guns during the confrontation, especially considering Martin's obstructed view and the witnesses' different vantage points. As the district court explained, "no witness purports to give an exhaustive account of the events or individuals involved." *Id.*

So the suppressed evidence doesn't undermine Bailey's testimony. Bailey told the jury that, unlike Martin, she couldn't see where the shooting began and, like Jackson, she identified multiple people as involved. Martin could have seen what Bailey admittedly could not as the shooting unfolded. And Bailey could have seen what Martin (again, with a truck in front of him) could not in the minutes before and after the shooting. Not to

---

[11] Jackson's follow-up statement doesn't say that she could identify the shooter, merely that she could identify a man running from the shooting "with [a] gun." J.A. 6933.

mention, King testified at trial that at least two men were involved in the shooting, and Ellison, who pleaded guilty, also implicated multiple individuals. So McPherson and Simmons's one-shooter theory fails at the start.

Even in the light most favorable to McPherson and Simmons, there's not "a reasonable probability" that the suppressed evidence would have led the jury to acquit the brothers of conspiracy to murder. *Gilliam*, 932 F.3d at 238. And because the undisclosed witness notes didn't include "especially pertinent exculpatory evidence," *Johnson*, 2020 WL 1169739, at *24, McPherson and Simmons haven't met the bad faith element (assuming they properly raised it in the first place).

We affirm the district court's summary judgment dismissal of the suppression claim.

IV.

A Maryland court determined that Kenneth McPherson and Eric Simmons were actually innocent of crimes for which the State incarcerated them for over two decades. Now a jury should decide whether the detectives who investigated them fabricated evidence that led to their incarceration.

We vacate the district court's judgment in part, affirm in part, and remand for further proceedings consistent with this ruling, including whether to reinstate any of the state-law claims that rested on the § 1983 fabrication claim.

*VACATED IN PART, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS*

30